Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| LUIS RAFAEL DÁVILA COLÓN<br><br>Parte Apelada<br><br>v.<br><br>HMTV DTC Y HMG; UNIVISIÓN COMMUNICATOINS, INC.; JAVIER COSME MATÍAS; HÉCTOR MARTÍNEZ SOUSS<br><br>Parte Apelante | KLAN202500404 | Apelación procedente del Tribunal de Primera Instancia, Sala de Bayamón<br><br>Civil núm.: GB2020CV00658<br><br>Sobre: INCUMPLIMIENTO DE CONTRATO, DAÑOS, LIBELO, CALUMNIA O DIFAMACIÓN |

Panel integrado por su presidente, el Juez Rivera Colón, la Juez Lebrón Nieves y el Juez Rodríguez Flores

Rodríguez Flores, Juez Ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 26 de junio de 2025.

Comparece la parte apelante, compuesta por Univision Communications, Inc. (UCI), Univision of Puerto Rico, Inc. (Univision PR), el Sr. Javier Cosme Matías (Sr. Cosme Matías) y el Sr. Héctor Martínez Souss (Sr. Martínez Souss) (en conjunto, Univision o parte apelante) y solicitan que revoquemos la *Sentencia Parcial* emitida el 7 de abril de 2025 por el Tribunal de Primera Instancia (TPI), Sala Superior de Bayamón.[1] Mediante dicho dictamen, el TPI adjudicó las mociones de sentencia sumaria de las partes y sus respectivas oposiciones. Así, declaró con lugar la causa de acción de incumplimiento de contrato incoada por el Sr. Luis Dávila Colón (Sr. Dávila Colón o apelado) contra Univisión, desestimó la aludida causa de acción respecto al Sr. Cosme Matías y el Sr. Martínez Souss, y declaró con lugar la causa de acción por libelo en cuento a todos los codemandados. A su vez, denegó dictar

---
[1] *Sentencia parcial*, Apéndice del recurso, págs. 2134-2171.

sentencia sumaria respecto a la causa de acción por daños extracontractuales, al concluir que ésta requiere la celebración de un juicio en su fondo.

El 6 de junio de 2025, el Sr. Dávila Colón presentó una *Oposición a apelación.*

Examinados los escritos de las partes litigantes, a la luz del derecho aplicable y por los fundamentos que expondremos a continuación, se *confirma* el dictamen apelado en cuanto a la causa de acción de incumplimiento de contrato y se *modifica* en cuanto a la causa de acción de libelo, únicamente a los fines de desestimar en cuanto al Sr. Martínez Souss y al Sr. Cosme Matías. Así modificada, se confirma el resto del dictamen apelado y se devuelve el caso al TPI para la continuación de los procedimientos, de conformidad con lo aquí resuelto.

**I.**

El 23 de octubre de 2020, el Sr. Dávila Colón incoó una *Demanda* sobre incumplimiento de contrato, daños y perjuicios y libelo en contra de Univision.[2] Posteriormente, el 26 de octubre de 2020, este presentó una *Demanda enmendada.*[3]

En síntesis, el Sr. Dávila Colón alegó que, el 24 de diciembre de 2009 suscribió un *Contrato de Prestación de Servicios Profesionales por Contratista Independiente* con Univision, el cual entró en vigor el 1 de enero de 2010 y estuvo vigente por cinco años; luego, el mismo fue renovado bianualmente de forma continua e ininterrumpida hasta febrero de 2020. En virtud del referido contrato, el Sr. Dávila Colón aportaba su talento como hombre de prensa y participaba como moderador, analista y comentarista de noticias y temas de interés general en la programación. Al respecto, arguyó que Univisión le proveyó unas guías de programación de

---

[2] *Demanda,* Apéndice del recurso, págs. 1-65.
[3] *Demanda enmendada,* Apéndice del recurso, págs. 67-133.

conformidad a los límites establecidos por la Comisión Federal de Comunicaciones (FCC por sus siglas en ingles) en las que establecían que el lenguaje a utilizarse no podía ser ofensivo o vulgar y que había que regirse a no utilizar las palabras prohibidas incluidas en la lista. Dicha guía establecía además que algunas de las palabras mencionadas podrían tener un significado no ofensivo y que podían utilizarse en ese contexto. El Sr. Dávila Colón añadió que la guía de programación le imponía a Univision la obligación de utilizar el sistema de retraso o *delay kill* para prevenir la transmisión de contenido profano, incluyendo las palabras prohibidas. Alegó que el 15 de junio de 2020, mientras discutía con sus panelistas en el segmento del programa radial *El Azote* un tema relacionado con el racismo, éste hizo unas expresiones sobre los vocablos que hacen las personas afroamericanas entre ellos y utilizó la palabra *nigga*, a modo de ilustrar la forma en que se expresan las personas afroamericanas entre sí. Arguyó que el director técnico, dentro de su discreción, no utilizó el mecanismo de *delay kill.* Dos días después de las expresiones, 17 de junio de 2020, el medio noticiero digital Latino Rebels – el cual opera fuera de Puerto Rico– reportó tales expresiones a las oficinas de Univisión en Estados Unidos. Por tal motivo, el Sr. Dávila Colón fue notificado sobre la terminación del Contrato de Servicios Profesionales por Contratista Independiente (Contrato) que otorgó con Univision.

Según surge de las alegaciones, Univision le notificó que terminaba su contrato inmediatamente por este haber infringido el cuarto párrafo del Contrato debido a las expresiones realizadas en el programa "El Azote" el 15 de junio de 2020. Ante esto, el Sr. Dávila Colón indicó que sus expresiones no fueron hechas con el propósito de ofender, insultar o degradar a las personas afroamericanas o afropuertorriqueñas, sino que fueron en manera ilustrativa para su público. Sostuvo que la decisión del director técnico de no emplear

el mecanismo de *delay kill* durante la transmisión demostraban que las expresiones no se encontraban en violación de la política pública de Univision. Finalmente, solicitó una indemnización por daños alegadamente sufridos por un comunicado de prensa emitido por Univisión donde fueron repudiadas sus expresiones emitidas el 15 de junio de 2020 y donde se anunció su despido.

El 18 de octubre de 2022, Univision presentó una *Contestación de UCI a la Demanda enmendada* en la que negó la mayoría de las alegaciones incoadas en su contra y alegó afirmativamente que las expresiones del Sr. Dávila Colón fueron catalogadas por la comunidad general como un insulto ofensivo y causaron desprestigio público a la imagen de Univision, infringiendo así, la cláusula número 4 del contrato de servicios, sobre reputación.[4]

Luego de varios trámites procesales innecesarios de pormenorizar, el 29 de febrero de 2024, Univision presentó una *Moción de sentencia sumaria*.[5] Sostuvo que no habían hechos materiales en controversia y que procedía la desestimación de la demanda en su totalidad. Arguyó que lo que debía resolverse era si la terminación del Contrato fue justificada, bajo sus propios términos; si los codemandados UCI, el Sr. Martínez y el Sr. Cosme responden por el alegado incumplimiento porque estos no eran partes contratantes; si hubo daños; y si las expresiones contenidas en el comunicado de prensa constituyen libelo y, de ser ese el caso, quienes son responsables.

En respuesta, el 15 de mayo de 2024, el Sr. Dávila Colón presentó *Oposición a moción de sentencia sumaria,* en la que solicitó que se dictara sentencia a su favor en cuanto a todas las

---

[4] *Contestación de UCI a la demanda enmendada*, Apéndice del recurso, págs. 643-656.
[5] *Moción de sentencia sumaria* de Univision, Apéndice del recurso, págs. 1253-1369.

reclamaciones de la demanda.[6] Adujo que sí existe controversia sobre si la terminación unilateral del Contrato constituyó un incumplimiento de contrato. Además, alegó que UCI y Univision PR no tienen dualidad jurídica, por lo que funcionan como una sola entidad, siendo ambas entidades responsables solidariamente. Asimismo, arguyó que procede determinarse si las expresiones de Univision a la prensa conducen a una actuación de libelo y calumnia en contra del Sr. Dávila Colón porque alegadamente no se había levantado opinión pública alguna sobre sus comentarios en el programa del 15 de junio 2020, hasta que Univision decidió presentar un comunicado de prensa. También, añadió que el Sr. Martínez Souss, como presidente y gerente general de Univision PR, y el Sr. Cosme Matías, como Director de Noticias y Contenido de Univision Radio en Puerto Rico, cooperaron voluntariamente para causarle daños previsibles al Sr. Dávila Colón, al participar de la cancelación del Contrato y diseminar el comunicado de prensa, por lo que responden en daños y perjuicios.

Por su parte, el 20 de mayo de 2024, el Sr. Dávila Colón presentó una *Moción de sentencia sumaria.*[7] Adujo que Univision sacó de contexto sus expresiones e ignoró que se debía utilizar, y que no se utilizó, el sistema de *delay kill* para evitar que palabras prohibidas, según las Guías de programación, salgan al aire. Alegó que después de que el programa del 15 de junio de 2020 salió al aire, Univision no se comunicó con el Sr. Dávila Colón. No obstante, arguyó que el comunicado de prensa que ofreció Univision demuestra un claro menosprecio a la verdad y que provocó un ataque mediático hacia su persona, tildándolo de racista, lo que resultó en daños a su reputación y angustias mentales.

---

[6] *Oposición a moción de sentencia sumara* del Sr. Dávila Colón, Apéndice del recurso, págs. 1495-1723.
[7] *Moción de sentencia sumaria* del Sr. Dávila Colón, Apéndice del recurso, págs. 1728-2013.

En respuesta, el 2 de agosto de 2024, Univision presentó *Oposición a moción de sentencia sumaria.*[8] Sostuvo que el incumplimiento por parte del Sr. Dávila Colón no está en controversia y que hubo razón suficiente para terminar con el Contrato, conforme a la cláusula de reputación.

El 7 de abril de 2025, el TPI emitió la *Sentencia parcial*[9] apelada. En esta el foro primario consignó 172 hechos incontrovertidos, de los cuales exponemos a continuación los pertinentes a la controversia ante nuestra consideración:

[...]

6. El 24 de diciembre de 2009, Univisión PR y el Demandante suscribieron "Contrato de Presentación de Servicios Profesionales por Contratista Independiente" (el Contrato), el cual entró en vigor el 1 de enero de 2010, con un término de vigencia de cinco (5) años).

7. Tras culminar el periodo de vigencia del Contrato de Servicios, las partes contratantes celebraron renovaciones bianuales continuas e ininterrumpidas, a saber, 2014, 2016, 2018 y por último en febrero de 2020.

8. El Contrato se renovó por última vez el 1ro de enero de 2020, con vigencia hasta el 31 de diciembre de 2020, con extensión automática, salvo previa cancelación, hasta el 31 de diciembre de 2021.

[...]

10. El Demandante en el programa "El Azote" cubría noticias de todo tipo, novedades políticas, sociales, económicas, culturales, deportivas, religiosas, en fin todo".

11. El Contrato fue suscrito por Univisión de PR, Inc. y Luis Dávila Colón.

12. El párrafo número 4 del Contrato dispone:

"Reputación. En la eventualidad de que el Contratista realice cualquier acto o se vea involucrado en cualquier situación que (i) cause o pueda causar a Univisión desprestigio público, desprecio, escándalo o ridículo, o, (ii) cuyo resultado sea escandalizar, insultar u ofender a la comunidad o, (iii) que tenga un efecto desfavorable en la reputación de Univisión, Univisión podrá dar por terminado de inmediato el presente contrato previa

---

[8] *Oposición a moción de sentencia sumaria* de Univision, Apéndice del recurso, págs. 2029-2132.
[9] *Sentencia parcial*, Apéndice del recurso, págs. 2134-2171.

notificación por escrito al Contratista, y éste respetará un período de seis (6) meses de enfriamiento a partir de la fecha en que se termine el contrato sin contratar con otra estación de radio. Durante ese período de enfriamiento, Univisión continuará pagando la remuneración mensual hasta expirado el mismo, conforme a la cláusula nueve (9)."

13. Por su parte, el inciso I. D. del Anexo A al Contrato dispone: "Dávila Colón ejercitará el más alto nivel de cuidado y discreción para proteger la buena imagen y 'goodwill' de Univision Radio".

14. Cuando el Demandante comenzó a trabajar en Univisión PR le entregó el documento titulado "Programming Guidelines for Univisión Radio".

15. El Demandante también recibió varias listas de palabras prohibidas por Univisión.

16. En la lista "English Version of Prohibited Words" se encuentra la palabra "nigga". Al final de dicha lista de palabras prohibidas en inglés también se indica "...and variations of those words, whether in English or Spanish". Dicha palabra es la única acompañada con un paréntesis que indica "bad taste".

17. El inciso número (5) de la Guía de Programación, titulado "Language", indica:

> "Language contained in programs broadcast over Univision should not be offensive or vulgar to the audience. Adherence to the list of "palabras prohibidas" for Univision Radio is required. Please note that some of the words listed may have a meaning which is not offensive, and may be used in that non-offensive context."

18. En enero de 2020, el Demandante fue suspendido por seis días sin paga porque se refirió a la entonces alcaldesa de San Juan como una política "perra".

19. El contrato firmado por el Demandante no contempla en ninguna parte suspensiones, ni descuentos de su compensación económica.

[…]

23. El lunes, 15 de junio de 2020, el Demandante dijo la palabra "nigga" al aire durante un segmento del programa "El Azote" mientras comentaba sobre "una controversia" relacionada al personaje "La Comay".

24. Cuando el Demandante dijo la palabra "nigga" al aire éste sabía que dicha palabra podía tener una connotación racista y que es parte del English Version of Prohibited Words de Univision PR.

[…]

27. El miércoles, 17 de junio de 2020, dos días después de la publicación, la entonces directora de comunicaciones de UCI recibió un mensaje de texto del periodista Julio Ricardo Varela indicando que había obtenido un "audio clip" de un anfitrión de radio en Puerto Rico y catalogando dicho contenido como muy desconcertante (very disturbing).

[...]

29. Previo al mensaje del Sr. Varela, Univisión no había recibido ninguna queja sobre las expresiones del Demandante.

30. Ninguna persona de la comunidad afroamericana se quejó de las expresiones del Demandante.

31. Varias personas hicieron expresiones a favor del Demandante en la actualización ("UPDATE") del reportaje publicado por el Sr. Varela comentando las expresiones del (sic) este, haciendo alusión al contexto en el que el Demandante hizo las expresiones.

32. Luego de obtener el consejo del equipo legal de Univisión y tras múltiples conversaciones con la gerencia, Luis Fernández Rocha, quien en ese momento era el Presidente Regional de UCI, recomendó la terminación del Contrato debido a la gravedad de la palabra usada en violación a la política de la compañía y el incidente anterior que el demandante había tenido.

33. El Sr. Fernández Rocha no revisó el contrato antes de recomendar la terminación del contrato.

34. El jueves, 18 de junio de 2020, el codemandado señor Cosme –en aquel entonces director de noticias de Univisión PR– y la jefa de recursos humanos, Jeannette Reyes, llamaron al Demandante por teléfono y le informaron sobre la decisión de Univision PR de terminar el Contrato como resultado de las expresiones realizadas el 15 de junio de 2020.

35. Ese mismo día, Univision envió a los medios de comunicación un Comunicado de Prensa, el cual varios medios publicaron. El comunicado leía: "Esta semana en WKAW Radio en Puerto Rico, Luis Dávila Colón usó un insulto ofensivo y despreciable. No toleramos ni aceptamos ese lenguaje ni actitud vil en nuestro centro de trabajo, ni al aire. Tras investigar la transmisión del Sr. [Dávila] Colón, Univisión dio fin a su contrato y canceló su programa de inmediato. Lamentamos mucho que se haya pronunciado ese insulto en nuestra señal de radio en Puerto Rico."

36. El Sr. Varela hizo la primera publicación del comunicado de prensa de Univision, anunciando la terminación de Contrato del Demandante, a las 10:45 am, mientras que la llamada telefónica de los directivos de Univision se realizó a eso de las 11:20 am.

37. El lunes, 22 de junio de 2020, Univisión PR le envió al Demandante una carta, firmada por el codemandado Héctor Martínez –en aquel entonces Presidente y Gerente General de Univisión PR–confirmándole por escrito la terminación inmediata del Contrato por razón de que sus expresiones del lunes, 15 de junio de 2020 violaron el párrafo 4 del Contrato. La carta indica que esa conducta, en conjunto con el incidente de enero del mismo año en el que sus comentarios al aire resultaron en una suspensión, es inaceptable, ofensiva y contraria a la misión de Univision.

38. Ni el comunicado de Prensa emitido el 18 de junio de 2020, ni la llamada que le hicieran al Demandante, el Sr. Cosme y la Sra. Reyes posteriormente el mismo día, mencionaron el incidente con relación a la entonces alcaldesa de San Juan como una razón para cancelar su Contrato.

39. La carta de terminación también indicaba que Univisión había decidido no enforzar el periodo de enfriamiento de los párrafos 4 y 9 del Contrato, por lo cual el Demandante estaba libre para ofrecerle sus servicios a cualquier otra emisora de radio. Finalmente, la carta concluyó indicando que se le iba a estar enviando el pago correspondiente al mes de junio de 2020.

40. El 25 de agosto de 2020, a dos meses de la terminación del Contrato, el medio de comunicación Noticel anunció que el Demandante se había integrado al programa "Nación Z Nacional", de Spanish Broadcasting System (SBS) Puerto Rico.

41. Entre los daños morales sufridos por el Demandante están, el que ha tenido que trabajar, a sus 71 años, para pagar hipoteca y automóvil y que ha estado expuesto a que le digan racista o machista.

42. Algunos de los daños a su reputación que ha sufrido el Demandante consisten en que se le vea como racista o machista y que, a veces, cuando sale a las tiendas o en foros de redes sociales hay personas que lo insultan y le dicen "racista".

43. El Demandante no ha visitado ningún médico, psicólogo, psiquiatra, terapista, ni ha acudido a ningún líder religioso o espiritual a buscar ayuda para lidiar con las angustias y sufrimiento que alega en la Demanda.

44. El despido del Demandante coincidió con la orden de cierre (lock down) emitida para todo Puerto Rico por la Gobernadora para esa fecha, a raíz de la pandemia provocada por el COVID-19, época en la que las oficinas médicas estaban cerradas y se extendió por un período de casi año y medio.

45. El Demandante sufrió un infarto neurocerebral en enero del 2020, a días luego de la suspensión de empleo y sueldo y meses antes de la terminación del Contrato.

[...]

47. En cuanto a su alegación de pérdida de ingresos, el Demandante solo produjo sus planillas de contribución sobre ingresos para los años 2014 al 2021 (...).

48. "Univisión no siempre tomaba en consideración el contexto en que se utiliza una 'palabra prohibida' al momento de aplicar el "delay kill".

49. [E]l lenguaje del inciso (5) de la Guía de Programación no requiere que se tome en consideración el contexto en que se utiliza una palabra prohibida al momento de utilizar el botón de "delay kill".

[...]

56. A través de los años, Univisión le facilitó al Demandante varias listas de "palabras prohibidas". Ninguna de ellas contenía una explicación que definiera o clarificara los contextos en los cuales dejaran de ser obscenas.

57. Las políticas de Univisión Radio son más estrictas que el estándar de indecencia de la FCC y prohíben la transmisión de cierto contenido al aire que pudiera ser ofensivo a la audiencia, aún si no es legalmente indecente bajo las reglas de la FCC.

58. Univisión no siempre tomaba en consideración el contexto en que se utiliza una "palabra prohibida" al momento de aplicar el "delay kill" de la Guía de Programación.

59. El inciso número cuatro (4) de la Guía de Programación dispone:

> "The delay system must be used at all times to prevent any profanity and any of the "palabras prohibidas" for Univision Radio from airing during an interview, phone call or otherwise. The "delay kill" button must be easily accessible to the person at the mike during any broadcast. A system that requires one person to signal another is not sufficient. If Talent or Producers do not comply with this requirement, then station management must contact J.D. Gonzalez or the Univision Legal Department. You should periodically test the delay system to verify that it is functional. The delay system is not optional."

60. Se desprende claramente del lenguaje del inciso (4) de la Guía de Programación que el "delay kill" se tiene que usar en todo momento para evitar que cualquiera de las "palabras prohibidas" de Univision Radio salga al aire. Nada dispone este inciso sobre el contexto en que se utiliza la palabra prohibida.

61. El inciso número cuatro (4) de la Guía de Programación les impone a las transmisiones de Univisión Puerto Rico la obligación de implementar un

sistema de retraso ("delay system" o "delay kill"), el cual funciona para prevenir la transmisión de contenido profano, incluyendo las "palabras prohibidas".

62. Mediante el sistema de retraso, la transmisión de la programación se retrasa por seis (6) a siete (7) segundos, permitiendo al director técnico escuchar el contenido de la programación antes de ser transmitida a la audiencia, lo que permite cortar cualquier expresión que entienda que no debe ir al aire.

63. La responsabilidad de operar el mecanismo de *delay kill* recaía en un director técnico, empleado por Univisión PR, para supervisar la producción de la programación radial, incluyendo la supervisión del contenido de toda transmisión y la operación del sistema de retraso.

64. Los talentos, como lo era el Demandante, no tienen acceso al *delay kill.*

65. Conforme a las Guías de Programación el director técnico no tiene discreción para silenciar o no una palabra, si la palabra está en la lista de las palabras prohibidas.

66. Univisión no siempre usaba el delay kill, ya que el director técnico no estaba al cien por ciento atento en todo momento a lo que se transmitía al aire.

67. Desde el 1 de enero de 2010 hasta el 18 de junio de 2020, el Demandante trabajó como analista de noticias, locutor y anfitrión del programa de radio "El Azote", un programa de análisis y discusión de noticias.

[…]

70. El 13 de enero de 2020, el Demandante estaba discutiendo en "El Azote", la decisión de la entonces Alcaldesa de San Juan por el Partido Popular Democrático ("PPD"), Carmen Yulín (en adelante, "Alcaldesa"), de celebrar las Fiestas de la Calle San Sebastián cuyo costo iba a ser de cinco (5) millones de dólares por solo cuatro días, en medio de una crisis debido a los terremotos que enfrentaba la isla para dicha fecha.

71. En la discusión, el Demandante se refirió a la Alcaldesa como "la candidata política más corrupta, más perra y más inmoral que hay en Puerto Rico".

72. Tras las expresiones del Demandante sobre el desempeño laboral de la Alcaldesa, el exgobernador por el PPD Aníbal Acevedo Vila, quien además, para ese momento conducía un programa en la emisora de Radio Isla el cual competía con la programación de Univisión (en adelante, "Sr. Acevedo"), comenzó una campaña en las redes sociales contra el Demandante.

73. Ante las alegaciones del Sr. Acevedo, previo a culminar el programa de ese mismo día, 13 de enero de

2020, el Demandante aclaró en vivo que utilizó la palabra "perra" conforme a la definición de la Real Academia Española, la cual define "perro, rra" como "muy malo", "indigno" y "persona despreciable", al igual que lo había hecho cuando llamó "perro" al Sr. Acevedo durante su gobernación. A su vez, aclaró que cuando utilizó la palabra no había hecho alusión alguna al termino de manera despectiva o con relación a género, sino hablando estrictamente de política, y se disculpó con la audiencia, si sus expresiones habían ofendido a alguien o habían sido mal entendidas.

74. El Demandante a través de sus redes sociales reiteró su disculpa y que la expresión no aludió al género de la Alcaldesa.

75. Univisión le solicitó al Demandante que se disculpara nuevamente, utilizando un comunicado preparado por esta.

76. El Demandante nuevamente se disculpó y compartió en sus redes sociales la disculpa preparada por Univisión.

77. No conforme con la disculpa, Univisión decidió suspender al Demandante por una semana.

[...]

82. El Demandante nunca recibió una notificación escrita sobre la suspensión o descuento compensación económica.

[...]

85. El Demandante volvió a "El Azote" el 23 de enero de 2020. En los meses de febrero, marzo, abril, mayo e inicios de junio, el Demandante continuó con su acostumbrado análisis de noticias y programación regular.

86. El 15 de junio de 2020, Demandante comentaba que el Sr. Acevedo iba a celebrar una actividad de recaudación de fondos (...). (...). Seguido, el Demandante comentó que había sido el Sr. Acevedo quien había comenzado un boicot en su contra y que ahora lo estaban haciendo con "La Comay".

87. El Demandante y su panel de comentaristas, continuaron discutiendo el boicot, promovido por grupos activistas, contra el programa televisivo de sátira "La Comay", por acusaciones de racismo en unas expresiones transmitidas durante la programación del 12 de junio de 2020, por el señor Kobbo Santarrosa ("Sr. Santarrosa"), anfitrión y figura pública del programa, sobre la licenciada Ana Irma Rivera Lassén ("Lcda. Rivera Lassen").

[...]

89. En discusión con el panel de comentaristas, el Demandante cuestionó la sustancia de las acusaciones de racismo contra el Sr. Santarrosa debido a que éste, al igual que la Lcda. Rivera Lassén, son afropuertorriqueños.

90. Para ilustrar su punto, el Demandante hizo referencia a las interpretaciones de las relaciones interpersonales entre los afroamericanos en las películas y realizó la siguiente expresión: *"Si tu bregas todas las películas de Hollywood, los propios afroamericanos se vacilan y se bufean, y se dicen, "How yo doin', boy? What's up, nigga? Ustedes saben que es así. O sea, un afroamericano con un afroamericano. Aquí un afropuertorriqueño con una afropuertorriqueña. Pero independientemente de eso, meterse en eso es sacar el tema del racismo..."*

91. El Demandante no dirigió su expresión a ninguna persona en particular.

92. Durante la transmisión del 15 de junio de 2020, el mecanismo del *delay kill* funcionaba como de costumbre.

93. Es el director técnico quien controla y está a cargo del contenido que se transmite al aire y de la utilización del *"delay kill".*

94. El director técnico de la transmisión del 15 de junio de 2020, no utilizó el botón de *delay kill* para silenciar las expresiones del Demandante.

95. El Sr. Guillermo Pacheco (en adelante, "Sr. Pacheco") era el director técnico presente cuando el Demandante transmitía el programa "El Azote".

96. El Director Técnico ejerce discreción al determinar cuando el contexto de ciertas expresiones requiere utlizare el *delay kill.* Sin embargo, hay ciertas palabras que se tienen que cortar, irrespectivamente del contexto en que se usen.

97. De acuerdo a la declaración del Sr. Pacheco su "lenguaje no es el inglés".

98. Si el Sr. Pacheco hubiese escuchado las expresiones del Demandante las hubiera silenciado.

99. El Sr. Pacheco no fue reprendido por no haber activado el *delay kill* para silenciar las expresiones del Demandante.

100. Los días 15 y 16 de junio de 2020, Univisión no recibió ninguna queja sobre las expresiones del Demandante.

[...]

106. Previo al mensaje del Sr. Varela Univision no había recibido ninguna queja sobre las expresiones del Demandante.

[...]

127. Univisión no revisó la lista de "palabras prohibidas" cuando estaba discutiendo las expresiones del Demandante.

128. La Sra. Kniowski y el Sr. Fernández Rocha eran ejecutivos de UCI con autoridad para terminar el contrato del Demandante.

129. El Sr. Fernández Rocha en su deposición declaró que el contexto en que se dicen las palabras es importante, para determinar si las expresiones de un talento, causan o pueden causar p[é]rdida de prestigio, desprecio, escándalo o ridículo y para determinar si la reputación de Univision se ve afectada.

[...]

136. El Demandante advino en conocimiento de la terminación de su Contrato a través de la prensa.

[...]

142. Luego de haber difundido la noticia de que UCI había terminado el contrato del Demandante, los ejecutivos de UCI instruyeron al Sr. Javier Cosme, entonces Director de Noticias y Contenido, y la Sra. Jeanette Reyes, entonces a comunicarse con el Demandante.

143. El 18 de junio de 2020, a las 11:20 am, la Sra. Reyes y el Sr. Cosme se comunicaron vía llamada telefónica para notificarle sobre la terminación de su contrato.

[...]

147. El 22 de junio de 2020 que (sic) el Demandante recibió por correo electrónico una carta titulada "Termination of Independent Contractor Agreement", notificándole formalmente sobre la terminación de su contrato. La carta está firmada por el Sr. Martínez. La misma fue enviada el lunes, 22 de junio de 2020 y está fechada para el 18 de junio de 2020, fecha de la terminación cuando se le comunicó al Demandante por teléfono.

148. El contenido de la Carta de Terminación es el siguiente:

"Dear Mr. Dávila Colón:

As you know, pursuant to paragraph 4 of your Independent contractor agreement can be immediately terminated with written notice in the event that you "engage in any act or are involved

in any situation that (i) causes or can cause Univision public disrepute, contempt, scandal or ridicule; (ii) which results in shocking, insulting or offending the community; or (iii) that has an adverse effect on Univision's reputation." Your comments on the program El Azote on June 15, 2020 violated paragraph 4 of the contract. This conduct, in addition to the January incident regarding your on-air comments resulting in your suspension, is unacceptable, offensive and contrary to Univision's mission to inform, empower, and entertain the community. As a result, this serves as written notice that your independent contractor agreement is terminated immediately and the program El Azote is cancelled. Finally, we hereby notify you that Univision has decided to waive its right to enforce the cooling-off period in paragraphs 4 and 9 of the contract. Accordingly, you are free to provide your services to any other radio company. Univision will send you your final payment under the contract for the month of June 2020."

[…]

151. La cláusula ocho (8) del Contrato de Servicios, lee:

"Cancelación. Univision podrá dar por terminado el presente Contrato por conveniencia, previa notificación por escrito al Contratista con diez (10) días de anticipación y Univision pagará al Contratista: (a) cualquier cantidad ganada y devengada por los Servicios prestados por el Contratista hasta esa fecha y todos los gastos no rembolsados, a cuyo reembolso tenga derecho el Contratista hasta dicha fecha únicamente, (b) sujeto al cumplimiento por parte del Contratista con las condiciones de la Sección 9, Univision le pagar[á] al Contratista una cantidad equivalente a la compensación mensual por un periodo de seis (6) meses ("Periodo de Enfriamiento")."

152. La cláusula nueve (9) del Contrato de Servicios, dispone:

"Periodo de enfriamiento. El contratista garantiza y acuerda que si este presente contrato es cancelado por Univision previo a la expiración del Término, durante el Periodo de Enfriamiento, el Contratista no podrá, directa o indirectamente, desempeñarse en servicios de Negocio Similar de Radio o actividades radiales dentro del Estado Libre Asociado. Para propósitos de esta Sección 9, el término "Negocio Similar" significa la misma o substancialmente la misma actividad o actividades de negocio desempeñadas o llevadas a cabo por el Contratista para, o a favor de, Univision.

153. El Contrato de Servicios no tenía disposición alguna que autorizara a Univision a renunciar a la cláusula de enfriamiento.

154. La única lista que incluye la palabra utilizada por el Demandante en su transmisión del 15 de junio de 2020, es la lista titulada English Versiono of Prohibited Words.

155. Mediante la Carta de Despido se le hizo mención por primera vez al Demandante de que Univision estaba: (1) tomando en consideración la suspensión de enero de 2020, como un factor para la terminación del Contrato; y (2) renunciando al periodo de enfriamiento y la compensación atada a este.

[…]

157. UCI activamente participó y tomó las decisiones en cuanto al desarrollo del Primer y Segundo Comunicado de Prensa y la terminación del Contrato del Demandante.

158. Esto sin haber escuchado el audio completo o discutir el contexto en el que el Demandante hizo las expresiones del 15 de junio de 2020.

159. A más de un mes de la divulgación del Segundo Comunicado, el 21 de agosto de 2020, el periódico Metro publicó un artículo anunciando que el analista Jay Fonseca ocuparía el espacio radial en WKAQ que antes ocupaba el Demandante con "El Azote" de 5:00 p.m. a 7:00 p.m., y mencionó que dicho espacio "era moderado por el analista Luis Dávila Colón quien fue despedido por comentarios racistas".

160. Asimismo, el 30 de agosto de 2020, el periódico El Nuevo Día publicó un artículo en el cual mencionó que al Demandante "Univisión le canceló en junio el contrato por hacer comentarios racistas".

161. UCI fue quien instruyó al Sr. Cosme y la Sra. Reyes a comunicarse con el Demandante sobre la cancelación de su contrato.

162. El Sr. Cosme participaba del proceso de contratación de los talentos y tenía que velar por el cumplimiento de las cláusulas de los contratos.

163. El Sr. Cosme en su deposición se identificó a sí mismo como miembro de la comunidad afropuertorriqueña, y dijo que no se sintió ofendido por las expresiones del Demandante por no pertenecer a la comunidad afroamericana.

164. Cuando el Sr. Martínez se comunicó con el Sr. Cosme estos no discutieron las cláusulas del Contrato del Demandante ni los comentarios o la impresión de la audiencia.

165. UCI fue quien produjo la carta informando al Demandante de la terminación su Contrato y se la envió al Sr. Martínez.

166. La decisión final de terminar con el contrato del Demandante la tomó UCI.

167. Univisión no ha recibido sanción por parte de la agencia federal reguladora de los medios de comunicaciones, el FCC, por actos o expresiones emitidas por el Demandante.

168. Ninguna persona de la comunidad afroamericana se quejó ante Univisión de las expresiones del Demandante.

169. No fue hasta que Univisión emitió los comunicados con su opinión sobre catalogó (sic) las expresiones del Demandante que la prensa y las personas en las redes sociales comenzaron a insultar al Demandante llamándolo racista.

170. Luego de la cancelación unilateral del Contrato, el Demandante tuvo que mitigar sus daños económicos, poder continuar sufragando sus gastos debido a la cancelación del Contrato que tenía vigencia hasta el 31 de diciembre de 2021 y el dinero que dejaría de devengar por, y debido a la renuncia unilateral [...] de UCI al periodo de enfriamiento.

171. Dos (2) meses después de la terminación del Contrato, el Demandante obtuvo trabajo en La Buena Noticia, en la cadena Mega, el cual dejó posteriormente.

172. Después del Comunicado de Prensa de Univisión, el Demandante ha sido insultado en la calle mientras está con su familia.[10]

Luego, el foro apelado estableció los siguientes hechos en controversia:

1. Si el demandante sufrió daños económicos como resultado de la terminación del contrato y su cuantía.

[2]. Si el demandante sufrió daños y angustias mentales como resultado de la terminación del contrato y su cuantía.

[3]. Si el demandante sufrió daños y angustias mentales por la publicación de los comunicados aquí determinada como libelosa y su cuantía.

[4]. La relación corporativa entre Univisión Florida y Univisión Puerto Rico para efectos del contrato suscrito por el demandante objeto de la demanda de epígrafe, a los fines de establecer cuál de las corporaciones

---

[10] Veáse, págs. 5, 15, 17, 19, 23 de la *Sentencia* apelada (Notas al calce omitidas.)

responde por los daños en que su día pruebe el demandante.

[5]. Relación en la intervención de Univision Communications, Inc., Javier Cosme Matías y Héctor Martínez Souss en la cancelación del contrato del demandante y en la difusión de los comunicados de prensa relacionados a su terminación y los daños reclamados por el demandante.

Ahora bien, en virtud de las anteriores determinaciones de hechos, el TPI concluyó que no había controversia de que el Sr. Dávila Colón y Univision PR suscribieron un contrato de prestación de servicios profesionales, que durante un segmento del programa *El Azote*, este pronunció la palabra "nigga", la cual se encontraba en la lista de palabras prohibidas y clasificada como *bad taste.* Al respecto, el foro primario destacó que el inciso 5 de la referida guía de palabras prohibidas establecía que algunas de estas podían tener un significado que no era ofensivo y podían ser utilizadas en ese contexto no ofensivo. En vista de lo anterior, el TPI concluyó que, contrario a lo alegado por Univision PR, la prohibición del uso de las palabras incluidas en la lista no era absoluta– en particular, la palabra en controversia– y que sí era relevante el contenido e intención en que se expresó. El TPI concluyó, luego de escuchar el audio y verificar la totalidad de la expresión, que la palabra en cuestión fue utilizada en el contexto no ofensivo reconocido en el inciso 5 de la guía de palabras prohibidas y que el Sr. Dávila Colón la utilizó de forma ilustrativa sobre la forma en que las personas afroamericanas se llaman entre sí y que dicho contexto no se considera ofensivo. Por consiguiente, el TPI concluyó que el Sr. Dávila Colón no incurrió en incumplimiento de contrato y que Univisión sí incurrió en incumplimiento contractual. Por tanto, el TPI declaró Ha Lugar la causa de acción de incumplimiento de contrato incoada por el Sr. Dávila Colón y ordenó a Univision pagar al Sr. Dávila Colón $187,500.00 correspondientes al periodo remanente del contrato contado desde la fecha de terminación hasta

el 31 de diciembre de 2021, así como una indemnización por los daños y perjuicios sufridos, sujeto a la prueba que se presente durante el juicio.

El TPI indicó que la responsabilidad de UCI, si alguna, en cuanto a esta causa de acción, quedaba sujeta a la determinación que hiciera el tribunal en cuanto a la relación entre UCI y Univision, conforme la prueba que se presentara en su día. No obstante, el TPI desestimó la demanda en cuanto a la causa de acción por incumplimiento de contrato respecto a los codemandados Sr. Martínez Souss y el Sr. Cosme Matías, por no haber sido partes contratantes en el contrato se servicios suscrito entre el Sr. Dávila Colón y Univision.

Asimismo, el TPI declaró Ha Lugar la causa de acción por libelo en cuanto a todos los demandados. Al respecto, el foro *a quo* determinó que el escándalo sobre las expresiones realizadas por el Sr. Dávila fue suscitado por Univision, a raíz del comunicado de prensa que publicó, el cual tenía contenido falso. Lo anterior, pues la palabra utilizada por el Sr. Dávila Colón se utilizó en el contexto no ofensivo, lo cual era "fácilmente apreciable" al escucharse la totalidad del audio del segmento. El TPI añadió que, en el comunicado, Univision le imputó al Sr. Dávila Colón una actitud vil en sus expresiones, lo cual no surge del audio del programa. Por tanto, el TPI concluyó que las expresiones vertidas por Univisión en su comunicado tuvieron un efecto inflamatorio hacia el Sr. Dávila Colón, pues el comunicado no se limitó a distanciarse de sus expresiones, sino que le imputó una intención vil que volcó la opinión pública, por lo que hubo malicia real, más cuando las partes envueltas en el comunicado no escucharon la totalidad del segmento ni el contexto en el que se dijo la palabra antes de emitir el mismo. Además, el TPI destacó que del propio contrato surge que utilizar el sistema de retraso (delay kill) era un requisito obligatorio, el cual no

fue utilizado por el director técnico de Univision. También señaló que no había controversia que ante la divulgación del referido comunicado se levantó una ola de comentarios hacia el Sr. Dávila Colón e imputaciones de que este es una persona racista. En virtud de lo anterior, concluyó que Univisión incurrió el libelo y declaró con lugar dicha causa de acción condenando a Univisión al pago de los daños ocasionados. La cuantía y proporción de los daños imputables a cada codemandado quedó sujeta a la prueba que se presente en el juicio.

En resumen, de la *Solicitud de sentencia sumaria parcial* presentada por Univision, el TPI únicamente declaró con lugar la desestimación de la causa de acción por incumplimiento de contrato en contra de los codemandados el Sr. Martínez Souss y el Sr. Cosme Matías, por estos no haber sido partes contratantes en el Contrato entre el Sr. Dávila Colón y Univision. En cuanto al resto de lo solicitado por Univision, el TPI lo declaró No Ha Lugar.

Por otro lado, el TPI dictó sentencia sumaria parcial a favor del Sr. Dávila Colón y declaró con lugar las causas de acción de incumplimiento de contrato -excluyendo a los mencionados codemandados- y la reclamación por libelo en cuanto a todos los codemandados. Por consiguiente, condenó a Univision al pago de los daños ocasionados en cada causa de acción, sujeto a la prueba que desfilará durante el juicio.

Finalmente, el TPI denegó la solicitud de sentencia sumaria parcial del Sr. Dávila Colón respecto a la causa de acción por daños extracontractuales, debido a que ésta depende de la prueba que se presente en el juicio sobre la existencia de los daños, la cuantía de éstos y el nexo causal entre éstos y las actuaciones negligentes determinadas en la sentencia parcial. A tenor con lo resuelto, el TPI ordenó la continuación del caso a los fines de recibir la prueba de daños contractuales y extracontractuales, así como de la proporción

correspondiente a cada codemandado, de acuerdo con su intervención y a la relación entre las corporaciones.

Inconforme con la determinación, Univision presentó el recurso de apelación de epígrafe e imputó al TPI la comisión de los siguientes errores:

> Erró el TPI al dictar sentencia en contra de Univision PR cuando esta entidad ya no era parte del caso de epígrafe porque, a solicitud del propio demandante y por disposición previa del TPI, había sido sustituida.

> Erró el TPI al concluir que el demandante, a pesar de utilizar al aire una palabra expresamente prohibida, no incumplió el contrato, que Univision sí lo incumplió y al conceder una cuantía por concepto de daños contractuales que excede lo que el demandante hubiese percibido bajo el contrato y que no contempla la mitigación de daños.

> Erró el TPI al concluir mediante sentencia sumaria que están presentes todos los elementos de una causa de acción de libelo, incluyendo el elemento de malicia real.

> Erró el TPI al no desestimar la causa de acción de libelo en cuanto a Martínez y Cosme cuando no existe evidencia en el récord de que éstos hayan participado en la redacción y/o publicación del comunicado de prensa.

El 6 de junio de 2025, el Sr. Dávila Colón presentó una *Oposición a apelación.*

## II.

### A.

La Regla 36 de Procedimiento Civil regula el mecanismo procesal de la sentencia sumaria, cuyo propósito principal es facilitar la solución justa, rápida y económica de casos civiles que no presentan controversias genuinas o reales sobre hechos materiales y esenciales.[11] Además, permite a los tribunales disponer, parcial o totalmente, de litigios civiles en aquellas

---

[11] *Oriental Bank v. Caballero García,* 212 DPR 671 (2023); *Rosado Reyes v. Global Healthcare,* 205 DPR 796 (2020); *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 109 (2015).

situaciones en las cuales no existe controversia real y que requiera ventilarse en un juicio plenario, por lo cual solo resta aplicar el derecho.[12]

En lo pertinente, procede dictar sentencia sumaria si de las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, junto a cualquier declaración jurada, si alguna, demuestran la inexistencia de controversia real y sustancial sobre algún hecho esencial y pertinente y que, como cuestión de derecho procede hacerlo.[13] De manera que, en aras de prevalecer en una reclamación, la parte promovente debe presentar prueba incontrovertible sobre todos los elementos indispensables de su causa de acción.[14]

El promovente de la sentencia sumaria deberá demostrar que no existe controversia real sustancial de ningún hecho material.[15] Un hecho material es definido como aquel que "puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable".[16] Se podrá derrotar una moción de sentencia sumaria si existe una "duda que permita concluir que existe una controversia real y sustancial sobre hechos relevantes y pertinentes".[17] Énfasis en el original, subrayado nuestro.

Nuestro ordenamiento civil establece unos requisitos de forma con los cuales se debe cumplir al momento de presentar una solicitud de sentencia sumaria. Estos son: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la cual se solicita la sentencia sumaria; (4) una relación concisa, organizada y en

---

[12] *Birriel Colón v. Econo y otros*, 213 DPR 80 (2023); *Oriental Bank v. Caballero García,* supra.

[13] Regla 36.3(e) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(e); *González Meléndez v. Mun. San Juan et. al,* 212 DPR 601 (2023); *Rosado Reyes v. Global Healthcare*, supra, págs. 808 y 809.

[14] *Íd.*

[15] Regla 36.3(a) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(a); *Birriel Colón v. Econo y otros*, supra; *Rosado Reyes v. Global Healthcare*, supra, pág. 808.

[16] *Const. José Carro v. Mun. Dorado*, 186 DPR 113, 129-130 (2012).

[17] *Íd.* pág. 130; *Pepsi-Cola v. Mun. Cidra et al.*, 186 DPR 713 (2012).

párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales se debe dictar la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido.[18]

Toda inferencia que se haga de los hechos incontrovertidos debe efectuarse de la forma más favorable a la parte que se opone a la sentencia sumaria.[19] Nuestro más alto foro ha expresado, que, "[e]l hecho de que la otra parte no presente prueba que controvierta la evidencia presentada por la parte promovente de la moción de sentencia sumaria, no implica necesariamente que dicha moción procederá automáticamente si verdaderamente existe una controversia sustancial sobre hechos relevantes y pertinentes".[20] Por otro lado, debemos resaltar, que;

> [...]no se dictará sentencia sumaria cuando: (1) existen **hechos materiales y esenciales controvertidos**; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción **una controversia real sobre algún hecho material y esencial**, o (4) como cuestión de derecho no procede."[21] (Énfasis nuestro).

De manera similar, el Tribunal Supremo ha recalcado que "[n]o es aconsejable usar el mecanismo de sentencia sumaria en casos donde hay elementos subjetivos, de intención, propósitos mentales o negligencia, o cuando el factor de credibilidad sea esencial para dilucidar la controversia del alegado discriminen."[22]

---

[18] *Oriental Bank v. Caballero García,* supra; Regla 36.3 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3.
[19] *Const. José Carro v. Mun. Dorado,* supra, pág. 130; *Pepsi-Cola v. Mun. Cidra et al.,* supra, a la pág. 756.
[20] *SLG Fernández-Bernal v. RAD-MAN et al.*, 208 DPR 310, 337 (2021).
[21] *Pepsi-Cola v. Mun. Cidra et al.,* supra, pág. 757. Citando a *SLG Szendrey-Ramos v. Consejo de Titulares,* 184 DPR 133, 167 (2011).
[22] *Segarra Rivera v. Int'l Shipping et al.*, 208 DPR 964, 980 (2022). Citando a *Soto v. Hotel Caribe Hilton,* 137 DPR 294, 301 (1994).

Cónsono con lo anterior, nuestro más Alto Foro ha reiterado que, el Tribunal de Apelaciones se encuentra en igual posición que los tribunales de primera instancia al revisar solicitudes de sentencia sumaria.[23] Es por lo que, el Tribunal de Apelaciones "está regido por la Regla 36 de Procedimiento Civil, *supra*, y aplicará los mismos criterios que esa regla y la jurisprudencia le exigen al foro primario".[24] El Tribunal de Apelaciones no podrá considerar documentos que no fueron presentados ante el TPI, ni adjudicar hechos materiales y esenciales en controversia.[25] Los criterios a seguir por este tribunal apelativo intermedio, al atender la revisión de una sentencia sumaria dictada por el foro primario, han sido enumerados con exactitud por nuestro Tribunal Supremo.[26] A tenor con lo anterior, el Tribunal de Apelaciones debe:

> 1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario;
>
> 2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*;
>
> 3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y
>
> 4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.[27]

Por ello, nuestra revisión es una *de novo*, y nuestro análisis debe regirse por las disposiciones de la Regla 36 de Procedimiento Civil, *supra*, y su jurisprudencia interpretativa.[28] De esta manera, si entendemos que los hechos materiales realmente están

---

[23] *Birriel Colón v. Econo y otros*, supra; *Rosado Reyes v. Global Healthcare*, supra, pág. 809.
[24] *Meléndez González et al. v. M. Cuebas,* supra, pág. 118.
[25] *Íd.* págs. 114 y 115.
[26] *Roldán Flores v. M. Cuebas et al*, 199 DPR 664, 679 (2018).
[27] *Íd.*
[28] *González Santiago v. Baxter Healthcare*, 202 DPR 281, 291 (2019).

incontrovertidos, debemos revisar *de novo* si el foro primario aplicó correctamente el derecho.[29]

**B.**

El Artículo 1042 del Código Civil de 1930 dispone que las obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos en que intervenga cualquier género de culpa o negligencia.[30] En cuanto a los contratos, el Art. 1044 del mismo código dispone que, "las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes y deben cumplirse al tenor de los mismos".[31] "Consecuentemente, un contrato existe desde que una o varias personas prestan su consentimiento a obligarse a dar alguna cosa o prestar algún servicio".[32] Es por ello, que el Artículo 1054 de ese código sujeta a aquellos que de alguna manera contravengan sus obligaciones a la indemnización de los daños y perjuicios causados.[33] Bajo dicho supuesto, todo incumplimiento contractual dará lugar a un resarcimiento.[34]

Los contratos serán válidos si concurren tres elementos: consentimiento, objeto y causa.[35] A su vez, "[l]os contratos serán obligatorios, cualquiera que sea la forma en que se hayan celebrado, siempre que en ellos concurran las condiciones esenciales para su validez".[36] El principio de la autonomía contractual que rige en nuestra jurisdicción "permite que las partes contratantes establezcan los pactos, las cláusulas y las condiciones que entiendan convenientes".[37] Esa autonomía estará limitada

---

[29] *Acevedo Arocho v. Departamento de Hacienda de Puerto Rico,* 212 DPR 335 (2023).
[30] 31 LPRA ant. sec. 2992.
[31] 31 LPRA ant. sec. 1994.
[32] *Rodríguez Ramos et al. v. ELA et al.,* 190 DPR 448, 455 (2014).
[33] 31 LPRA ant. sec. 3018.
[34] *Álvarez v. Rivera,* 165 DPR 1, 18 (2005).
[35] Art. 1213 del Código Civil de 1930, 31 LPRA ant. sec. 3391.
[36] Art. 1230 del Código Civil de 1930, 31 LPRA ant. sec. 3451.
[37] *Rodríguez Ramos et al. v. ELA et al.,* supra, págs. 455-456; Art. 1207 del Código Civil, 31 LPRA ant. sec. 3372.

únicamente, y el contrato será nulo e inexistente, si este último resulta contrario a las leyes, a la moral o al orden público.[38]

Asimismo, el Artículo 1210 del Código Civil de 1930[39] establece que los contratos se perfeccionan desde el mero consentimiento entre las partes. Además, dispone que obligan tanto al cumplimiento de lo expresamente pactado, como a las consecuencias que sean conformes a la buena fe, al uso y la ley, según la naturaleza de lo pactado.[40] "En tales casos, cualquiera de las partes contratantes puede impugnar el contrato, aunque se haya beneficiado del mismo".[41]

A su vez, es norma conocida en materia de interpretación de contratos que "[s]i los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas"[42]. Por el contrario, "[s]i las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquéllas". Asimismo, ante la diversidad de sentidos que pueda contener una cláusula, se deberá, en claro principio de la conservación del contrato, interpretar en el sentido más adecuado para que el contrato tenga efecto.[43]

### C.

Nuestra Constitución dispone en la Sección 8 del Artículo II que "[t]oda persona tiene derecho a la protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar".[44] De esta disposición surge la protección a un ciudadano contra la difamación. La difamación se ha definido como "[d]esacreditar a una persona publicando cosas contra su

---

[38] 31 LPRA ant. sec. 3372; *Rodríguez Ramos et al. v. ELA et al.*, supra, pág. 456.
[39] 31 LPRA ant. sec. 3375.
[40] *Íd.*
[41] *Íd.*
[42] Artículo 1233 del Código Civil, 31 LPRA ant. sec. 3471.
[43] Artículo 1236 del Código Civil, 31 LPRA ant. sec. 3474.
[44] Const. P.R., Art. II, Sec. 8, LPRA Tomo 1.

reputación".[45] A su vez, la protección contra expresiones difamatorias se encuentra tipificada en la Ley de Libelo y Calumnia.[46]

En *Clavell v. El Vocero de PR,* nuestro Tribunal Supremo determinó que "[d]os preceptos constitucionales en nuestro ordenamiento jurídico enmarcan el derecho de difamación".[47] Por un lado, el Tribunal Supremo se refiere al derecho de cada ciudadano contra ataques abusivos a su honra y reputación *vis a vis* con el derecho de todo ciudadano a la libertad de expresión o prensa.

La reclamación por difamación tiene dos vertientes en las cuales admite una reclamación por libelo y otra por calumnia. La Ley de Libelo y Calumnia[48], define el término libelo como:

> [L]a difamación maliciosa que públicamente se hace en contra de una persona, por escrito, impreso, signo, retrato, figura, efigie u otro medio mecánico de publicación, tendente a exponer a dicha persona al odio del pueblo o a su desprecio, o a privarle del beneficio de la confianza pública y trato social, o a perjudicarle en sus negocios; o de otro modo desacreditarle, menospreciarle o deshonrarle, o cualquiera difamación maliciosa publicada, como antes se ha dicho, con la intención de denigrar o deprimir la memoria de un muerto y desacreditar o provocar a los parientes y amigos sobrevivientes.

Por otro lado, la precitada ley define calumnia como aquella "[p]ublicación falsa o ilegal, que no sea un libelo, y que impute a una persona la comisión de un hecho constitutivo de delito, o tienda directamente a perjudicarle con relación a su oficina, profesión, comercio o negocios, o que, como consecuencia natural, le cause daños reales y efectivos".[49]

Los elementos constitutivos de la causa de acción por difamación dependerán, en primera instancia, de si el demandante

---

[45] *Pérez Rosado v. El Vocero de PR*, 149 DPR 427, 441 (1999).
[46] 32 LPRA sec. 3141 et seq.
[47] *Clavell v. El Vocero de PR,* 115 DPR 685, 690-692 (1984).
[48] 32 LPRA sec. 3142.
[49] 32 LPRA sec. 3143.

es una persona privada o una figura pública. Para que una persona privada tenga éxito en su causa de acción por libelo, deberá probar: (1) que la información difamatoria publicada es falsa; (2) que la publicación se hizo de forma negligente; y (3) que su publicación le causó daños reales.[50] Sin embargo, cuando se trata de una figura pública, se le requiere al demandante demostrar, además, que la información fue publicada con malicia real, es decir, a sabiendas de que era falsa o con grave menosprecio de si era falsa o no.[51] La malicia real no puede presumirse, por lo que el estándar de prueba es de clara, robusta y convincente.[52]

### III.

Conforme al derecho antes expuesto, el primer y segundo paso del estándar que este Tribunal debe utilizar para revisar la concesión o denegatoria de una solicitud de sentencia sumaria es una revisión de *novo* del expediente del caso de epígrafe y corroborar que tanto la solicitud como la oposición a sentencia sumaria cumplan con los requisitos de la Regla 36 de Procedimiento Civil.[53] Tras revisar sendas solicitudes de sentencia sumaria, concluimos que los escritos cumplieron con los requisitos de forma establecidos en la precitada regla. Ambas partes propusieron los hechos que a su juicio están incontrovertidos, junto a los documentos en apoyo. De igual forma, ambos cumplieron con la Regla 36.3 (b) de Procedimiento Civil al oponerse.[54]

Para el tercer y cuarto paso de nuestro análisis debemos evaluar si existen hechos materiales en controversia y, de existir, delimitarlos. De no haber hechos en controversia, procede que

---

[50] *Pérez Rosado v. El Vocero de P.R.,* supra, pág. 442; *Villanueva v. Hernández Class*, 128 DPR 618, 642 (1991).
[51] *Villanueva v. Hernández Class,* supra, 642.
[52] *Colon Pérez v. Televicentro de PR*, 175 DPR 690, 725 (2009).
[53] Regla 36 de Procedimiento Civil, *supra.*
[54] Regla 36.3 (b) de Procedimiento Civil, *supra.*

revisemos de *novo* si el foro primario aplicó correctamente el Derecho.

En el presente caso, el TPI concluyó que, conforme al Contrato y a la Guía de Programación, la prohibición de uso de las denominadas palabras prohibidas no era absoluta dado a que sí era relevante el contexto y la intención al utilizarse. Esto, porque según la propia guía, algunas palabras podrían tener un contexto no ofensivo y, en ese contexto, podrían utilizarse. El TPI determinó que la palabra utilizada por el Sr. Dávila Colón, según definida en el diccionario Merriam Webster, constituye un insulto ofensivo, pero que no lo es cuando es usada entre personas de la raza negra para referirse a sí mismas. Mencionó que el apelado usó la palabra de forma ilustrativa como ejemplo de lo que define el diccionario como contexto no ofensivo y que ésta no estaba dirigida a ninguna persona. Además, determinó que no había prueba en el expediente que demostrara que las expresiones del Sr. Dávila Colón hayan suscitado escándalo; hayan sido utilizadas para insultar u ofender a la comunidad; que su expresión pudiera causar desprestigio público a Univision o que tuviera un efecto desfavorable en su reputación, para apoyar la terminación temprana del Contrato en virtud de la cláusula cuatro (4) de reputación. Por tal razón, resolvió que Univision incumplió el Contrato por no tener razón suficiente para cancelarlo antes de su vencimiento.

De una minuciosa revisión al expediente, concluimos que no existen hechos en controversia y que las determinaciones de hechos del TPI encuentran apoyo en la prueba que surge del expediente.

En cuanto al primer señalamiento de error, la parte apelante arguyó que el TPI emitió un dictamen nulo sobre Univision PR porque esta entidad fue previamente sustituida por HMG a solicitud del propio apelado. Surge del expediente que, el 19 de marzo de 2024, el TPI declaró Ha Lugar la petición del Sr. Dávila Colón a la

sustitución de Univision PR por HMTV DTC y HMG.[55] En los casos de sustitución por cesión de interés, la sustitución es optativa y el trámite procesal de sustitución en nada afecta los derechos sustantivos de las partes.[56] En este caso, aunque se autorizó la sustitución, el apelado no trajo al pleito a HMTV DTC y HMG. La acción tampoco fue desistida para Univision PR. Además, obsérvese que, aun cuando HMTV DTC y HMG no fueron emplazados para incluirlos al pleito como parte demandada, Univision PR compareció en la *Oposición a moción de sentencia sumaria* junto al resto de los codemandados. Univision se sometió y se mantuvo bajo la jurisdicción del TPI efectuando actos afirmativos para defenderse y solicitando remedios a su favor. Por tanto, el error no se cometió.

En cuanto al segundo señalamiento de error, Univision alegó que el TPI incidió al considerar el contexto en que el apelado usó la palabra *nigga* porque, independientemente del contexto, las políticas de Univision no dan paso al uso de las palabras prohibidas. Sobre la compensación, cuestionó que el cálculo de los pagos dejados de devengar se hiciera por dieciocho (18) meses y no por seis (6), asumiendo como un hecho la extensión automática del Contrato. Además, argumentó que el TPI no contempló los ingresos que el apelado comenzó a percibir dos meses después de la terminación del Contrato.

Evaluada la prueba documental en su totalidad, concluimos que, en este caso el contexto en que se usan las palabras sí es relevante para conformar las disposiciones del Contrato. Pues la Guía de programación, la lista de palabras prohibidas y el Contrato se deben interpretar en conjunto. Para el Sr. Fernández —Presidente Regional de UCI—, el contexto es importante para determinar si la

---

[55] *Orden emitida el 19 de marzo de 2024,* Apéndice del recurso, pág. 1425.
[56] *Mun. de San Juan* v. *Bosque Real SE,* 158 DPR 743, 759 (2003).

reputación de Univision se puede ver afectada[57]; según la disposición de lenguaje de la Guía de Programación algunas palabras podrían tener un significado no ofensivo y podrían ser usadas en ese contexto no ofensivo[58]; y para la Sra. Reyes —Jefa de Recursos Humanos— el contexto en que se dicen las palabras es importante para determinar su significado[59]. De los hechos esenciales e incontrovertidos enumerados por la parte apelada en su petición de sentencia sumaria, y la prueba documental que anejó para sustentarlo, quedó demostrado que Univision incumplió con el Contrato al no considerar el contexto en que se utilizó la palabra por parte del Sr. Dávila Colón y basar su terminación temprana en la cláusula de reputación.

Por otra parte, Univision no logró demostrar que las expresiones del apelado causaron o podían causar a Univisión desprestigio; escándalo, insulto u ofender a la comunidad; o un efecto desfavorable en su reputación. Univision no rebatió el hecho de que la única queja la presentó el Sr. Varela y que, por virtud del comunicado de prensa, se difundió el tema de la controversia. Además, el lenguaje de la Cláusula (5) de la Guía de Programación no requiere que se tome el contexto de la palabra para utilizar el *delay kill,* sin embargo, ese día no se utilizó.

Tras evaluar los hechos y el derecho aplicable, coincidimos con el razonamiento del TPI. El foro primario no erró al declarar Ha Lugar la solicitud de sentencia sumaria del apelado en cuanto al incumplimiento de contrato.

Ahora bien, en cuanto a la concesión del remanente de la remuneración, la última renovación del Contrato establece que

---

[57] *Moción de Sentencia Sumaria* del Sr. Dávila Colón, Apéndice del recurso, págs. 1744-1745, hecho propuesto núm. 90.
[58] *Moción de Sentencia Sumaria* del Sr. Dávila Colón, Apéndice del recurso, págs. 1733-1734, hecho propuesto núm. 17.
[59] *Moción de Sentencia Sumaria* del Sr. Dávila Colón, Apéndice del recurso, pág. 1747, hecho propuesto núm. 107.

podrá ser extendido automáticamente hasta el 31 de diciembre de 2021, salvo que se notifique previamente su terminación. Es decir, surge la previsibilidad de que el Contrato fuera extendido si nada se decía antes de su vencimiento, por lo que, tal y como resolvió el TPI, la compensación corresponde hasta la fecha del 31 de diciembre de 2021 cuando vencía el Contrato.

En cuanto al tercer error, la parte apelante alegó que no están presentes los elementos para una causa de acción por libelo porque, a su juicio, el apelado no presentó prueba alguna que demostrara la malicia real. Adujo que, Univision tenía fundamentos suficientes para concluir que el apelado usó un insulto racista y ofensivo al aire.

Tras escuchar el audio, el TPI concluyó que el comunicado de prensa tenía contenido falso porque el apelado usó la palabra en el contexto no ofensivo. Determinó que dicho comunicado imputaba al apelado una actitud vil en su expresión y, por ello, concluyó que Univision actuó con malicia real. Añadió que el comunicado de prensa tiene una intención de divulgación pública y un potencial de afectar la opinión pública en cuanto al apelado.

Conforme al derecho antes expuesto, en una acción de libelo en el caso de una figura privada, el demandante deberá probar los requisitos siguientes: (1) que la información es difamatoria y falsa; (2) que la publicación se hizo de forma negligente, y (3) que se le causaron daños reales.[60] En los casos en que estén involucrados funcionarios o figuras públicas, el demandante deberá probar, además, que la información fue publicada con malicia real.[61] Tanto en un caso de calumnia o de libelo, la causa es justiciable *per se* – o sea, que no hay que alegar ni probar daños específicamente cuando se imputa un hecho (a) constitutivo de delito o (b) que tienda

---

[60] *Pérez Rosado v. El Vocero de P.R., Inc.*, supra, 442.
[61] *Ojeda v. El Vocero de P.R, supra,* 328-329.

directamente a perjudicar a una persona en su oficina, profesión, comercio o negocio."[62]

El comunicado de prensa del 17 de junio de 2020 Univision expresa que el apelado usó un insulto ofensivo y despreciable al aire. Está claro que el apelado expresó una de las denominadas palabras prohibidas. Sin embargo, Univision escuchó parte del programa radial, pero no consideró el contexto en que se utilizó la palabra a pesar de que sus guías no establecen una prohibición absoluta en la expresión de las denominadas palabras prohibidas y le imputó al apelado usar un lenguaje y actitud vil. Dado a ello, concluimos que se cumplieron con los elementos para probar la causa de acción por libelo. Univision imputó al apelado usar un lenguaje ofensivo lo que lo expuso al desprecio de la comunidad radioyente. Dicha publicación expuso al Sr. Dávila Colón a que lo tildaran de racista. En tal caso, al perjudicarlo en su profesión como locutor, se considera un libelo *per se* que no requiere demostrar prueba de daños. Entendemos que este error tampoco se cometió.

En cuanto al cuarto señalamiento de error, alegó que no hay determinaciones de hechos que concluyan que el Sr. Martínez Souss y el Sr. Cosme Matías participaron en la redacción y/o publicación del comunicado de prensa, por lo que sostuvo que procede la desestimación de las reclamaciones en contra de estos.

De un análisis del expediente no encontramos prueba alguna que demuestre que el Sr. Martínez Souss y el Sr. Cosme Matías intervinieron en la redacción y difusión de los comunicados de prensa particularmente. Por lo cual, este error sí se cometió. No hay razón para mantenerlos en esta causa de acción. En consecuencia, se modifica la determinación del TPI declarando Ha Lugar la causa de acción de libelo en cuanto a todos los demandados, a los fines de

---

[62] *Pérez v. El Vocero de PR,* supra, 443.

excluir a al Sr. Martínez Souss y al Sr. Cosme Matías de responsabilidad por libelo.

**IV.**

Por los fundamentos expuestos, se *confirma* la *Sentencia parcial* apelada en cuanto a la causa de acción de incumplimiento de contrato y se *modifica* respecto a la causa de acción de libelo, a los fines de desestimar dicha reclamación en cuanto al Sr. Martínez Souss y al Sr. Cosme Matías.

Se devuelve el caso al TPI para la continuación de los procedimientos, de conformidad con lo aquí resuelto.

Notifíquese.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones